**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **KARETEK HOLDINGS LLC,** | **CIVIL ACTION NO.** |
| **Plaintiff,** | **1:21-cv-621-LPS** |
| **v.** | **PATENT CASE** |
| **STRIPE, INC.,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

**DEFENDANT STRIPE, INC.'S RULE 12(c)**
**MOTION FOR JUDGMENT ON THE PLEADINGS**

FISH & RICHARDSON P.C.

Jeremy D. Anderson (No. 4515)
222 Delaware Avenue, 17th Floor
Wilmington, Delaware 19801
(302) 658-5070 (Telephone)
(302) 652-0607 (Facsimile)
janderson@fr.com

Neil J. McNabnay
Ricardo J. Bonilla
Adil A. Shaikh
1717 Main Street, Suite 5000
Dallas, Texas 75201
(214) 747-5070 (Telephone)
(214) 747-2091 (Facsimile)
mcnabnay@fr.com
rbonilla@fr.com
shaikh@fr.com

*Attorneys for Defendant*
*Stripe, Inc.*

Dated: June 15, 2021

# <u>TABLE OF CONTENTS</u>

I.   NATURE AND STAGE OF PROCEEDINGS ........................................................ 1

II.   SUMMARY OF THE ARGUMENT ................................................................. 1

III.   STATEMENT OF THE FACTS .................................................................... 2

IV.   ARGUMENT ......................................................................................... 4

    A.   LEGAL STANDARD .......................................................................... 4

        1.   This case should be decided at the pleading stage under Rule 12(c). .......... 4

        2.   The law of 35 U.S.C. § 101. .................................................... 5

    B.   The claims of the '515 Patent are patent-ineligible. ................................. 5

        1.   Claim 4 of the '515 Patent is representative. ................................. 6

        2.   *Alice* Step 1: The '515 Patent is directed to the abstract idea of confidentially authenticating a user. ........................................... 9

        3.   *Alice* Step 2: Claim 4 contains no inventive concept to transform the abstract idea into patent-eligible subject matter ........................... 14

        4.   There are no claim construction or factual disputes preventing the Court from ruling on these issues at the Rule 12 stage. .................................................................... 18

V.   CONCLUSION ....................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aegis 11 S.A. v. Tte Tech., Inc.*,
  No. CV 19-1165-RGA, 2020 WL 4050415 (D. Del. July 20, 2020)......................................11

*Affinity Labs of Texas, LLC v. Amazon.com Inc.*,
  838 F.3d 1266 (Fed. Cir. 2016).........................................................................................13

*Affinity Labs of Texas, LLC v. DirectTV, LLC*,
  838 F.3d 1253 (Fed. Cir. 2016).........................................................................................12

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014)............................................................................................... *passim*

*Ancora Techs., Inc. v. HTC America, Inc.*,
  908 F.3d 1343 (Fed. Cir. 2018).....................................................................................12, 13

*Appistry, Inc. v. Amazon.com, Inc.*,
  195 F. Supp. 3d 1176 (W.D. Wash., 2016) ............................................................................19

*Apple, Inc. v. Ameranth, Inc.*,
  842 F.3d 1229 (Fed. Cir. 2016).........................................................................................12

*Asghari-Kamrani v. United Servs. Auto. Ass'n*,
  No. 2:15-cv-478, 2016 WL 3670804 (E.D. Va. July 5, 2016).............................................1, 11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).......................................................................................................5

*Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016).........................................................................................17

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018).....................................................................................18, 19

*Bilski v. Kappos*,
  561 U.S. 593 (2010)..................................................................................................5, 8, 9

*buySAFE v. Google, Inc.*,
  765 F.3d 1350 (Fed. Cir. 2014).........................................................................................17

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
  776 F.3d 1343 (Fed. Cir. 2014)......................................................................................6, 10

*Cuvillier v. Sullivan*,
　503 F.3d 397 (5th Cir. 2007) ........................................................................5

*Data Engine Techs. LLC v. Google LLC*,
　906 F.3d 999 (Fed. Cir. 2018)................................................................12, 13

*Digital Media Techs., Inc. v. Hulu, LLC*,
　No. 4:16-cv-245, 2017 WL 4750705 (N.D. Fla. July 3, 2017)....................16

*Dropbox, Inc. v. Synchronoss Techs., Inc.*,
　815 F. App'x 529 (Fed. Cir. 2020) .............................................................19

*Elec. Power Group, LLC v. Alstom S.A.*,
　830 F.3d 1350 (Fed. Cir. 2016)..............................................................12, 13

*Enfish, LLC v. Microsoft Corp.*,
　822 F.3d 1327 (Fed. Cir. 2016)..........................................................12, 13, 14

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
　839 F.3d 1089 (Fed. Cir. 2016)....................................................................13

*Finjan, Inc. v. Blue Coat System, Inc.*,
　879 F.3d 1299 (Fed. Cir. 2018)......................................................................9

*First-Class Monitoring, LLC v. Ups of Am., Inc.*,
　389 F. Supp. 3d 456 (E.D. Tex. 2019) .........................................................19

*Genetic Techs. Ltd. v. Merial L.L.C.*,
　818 F.3d 1369 (Fed. Cir. 2016)......................................................................5

*Gibbs v. Coupe*,
　No. CV 14-790-SLR, 2015 WL 6870033 .....................................................4

*Guyzar LLC v. StubHub, Inc.*,
　No. 18-1257, D.I. 39 (D. Del. July 18, 2019) (Connolly, J.)........................1

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
　792 F.3d 1363 (Fed. Cir. 2015)....................................................................17

*Intellectual Ventures I LLC v. J. Crew Grp., Inc.*,
　No. 6:16-cv-196-JRG, 2016 WL 4591794 (E.D. Tex. Aug. 24, 2016) ..................13

*Intellectual Ventures I LLC v. Symantec Corp.*,
　838 F.3d 1307 (Fed. Cir. 2016)....................................................................11

*Intellectual Ventures II LLC v. JP Morgan Chase & Co.*,
　No. 13-cv-3777, 2015 WL 1941331 (S.D.N.Y. Apr. 28, 2015) ..............15, 16

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016)......................................................................12, 13

*Mgmt. Sci. Assocs. v. Datavant, Inc.*,
    No. 20-0502, 2020 WL 7771156 (D. Del. Dec. 30, 2020) (Connolly, J.) ...............................8

*Money & Data Prot. Lizenz GMPH & Co. KG v. Duo Sec., Inc.*,
    468 F. Supp. 3d 674 (D. Del. 2020)...................................................................11

*O2 Micro Intl. Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008)......................................................................18

*OpenTV, Inc. v. Apple Inc.*,
    No. 5:15-cv-02008-EJD, 2016 WL 344845 (N.D. Cal. Jan. 28, 2016) ..................................16

*Paone v. Broadcom Corp.*,
    No. 15-CV-0596-BMC-GRB, 2015 WL 4988279 (E.D.N.Y. Aug. 19, 2015).....................15

*Phoenix Licensing, L.L.C. v. Consumer Cellular, Inc.*,
    No. 2:16-cv-0152-JRG-RSP, 2017 WL 1065938 (E.D. Tex. Mar. 8, 2017) ...........................6

*PPS Data, LLC v. Jack Henry & Assocs., Inc.*,
    No. 2:18-cv-00007-JRG, 2019 WL 1317286 (E.D. Tex. Mar. 21, 2019)............................6, 8

*Pragmatus Telecom., LLC v. Genesys Telecommc'ns. Labs., Inc.*,
    114 F. Supp. 3d 192 (D. Del. 2015)................................................................17, 18

*Prism Techs. LLC v. T-Mobile USA, Inc.*,
    Nos. 2016-2031, 2016-2049, 2017 WL 2705338 (Fed. Cir. June 23, 2017) ..........................16

*SAP Am., Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018).......................................................................9

*Simio, LLC v. FlexSim Software Prods., Inc.*,
    983 F.3d 1353 (Fed. Cir. 2020)......................................................................20

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016)..........................................................1, 12, 13, 17

*Turbe v. Government of the Virgin Islands*,
    938 F.2d 427 (3d Cir. 1991)...........................................................................4

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017).......................................................................9

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) (Mayer, J., concurring).......................................5, 14

*Universal Secure Registry LLC v. Apple Inc.*,
    469 F. Supp. 3d 231 (D. Del. 2020) (Connolly, J.)............................................................1, 10

*Victaulic Co. v. Tieman*,
    499 F.3d 227 (3rd Cir. 2007) .......................................................................................4

*Visual Memory LLC v. NVIDIA Corp.*,
    867 F.3d 1253 (Fed. Cir. 2017)..............................................................................12, 13

*Zapfraud, Inc. v. FireEye, Inc.*,
    No. CV 19-1688, 2020 WL 6822972 (D. Del. Nov. 20, 2020) .............................................11

**Statutes**

35 U.S.C. § 101 .............................................................................................. *passim*

**Other Authorities**

Fed. R. Civ. P. 12 ......................................................................................................11, 18

Fed. R. Civ. P. 12(b)(6)..............................................................................................4, 19, 20

Fed. R. Civ. P. 12(c) ......................................................................................................4, 20

## I.      NATURE AND STAGE OF PROCEEDINGS

On April 30, 2021, Karetek Holdings LLC filed this lawsuit accusing Stripe, Inc. of infringing Claim 20 of U.S. Patent No. 7,373,515 by using FIDO U2F compliant security keys on Stripe's website. (D.I. 1 ¶ 32 ("Complaint").)[1]

## II.     SUMMARY OF THE ARGUMENT

The claims of the '515 Patent are directed to the abstract idea of confidentially authenticating a user. But authentication, as many courts have held, is not a technological improvement, an inventive way of applying conventional technology, or even new. *See, e.g., Universal Secure Registry LLC v. Apple Inc.*, 469 F. Supp. 3d 231, 238 (D. Del. 2020) (Connolly, J.) (invalidating claims directed to secured verification of a person's identity)*; Asghari-Kamrani v. United Servs. Auto. Ass'n*, No. 2:15-cv-478, 2016 WL 3670804, at *4-5 (E.D. Va. July 5, 2016), amended, 2016 WL 11642758 (E.D. Va. Aug. 15, 2016), aff'd, No. 16-2415 (Fed. Cir. 2018) (invalidating claims directed to transmitting a code or token to a user to be used to access a system); *Guyzar LLC v. StubHub, Inc.*, No. 18-1257, D.I. 39 (D. Del. July 18, 2019) (Connolly, J.) (invalidating claims directed to confidentially authenticating a user via a third party). Rather, the '515 Patent claims are directed to "the use of conventional or generic technology in a nascent but well-known environment." *In re TLI Commc'ns LLC Patent Litig.,* 823 F.3d 607, 612 (Fed. Cir. 2016).

No particular non-conventional component, programming, or ordered combination is either claimed or disclosed. Instead, the claims use result-based functional language and only recite a desired goal of confidentially authenticating a user and allowing the user to login to multiple sites

---

[1] Karetek alleges infringement of Claim 20, but lists the method steps of Claim 4 as the alleged "specific elements" that "accomplish [the] desired results" of the purported invention. (*See* Complaint ¶ 24.) Further, Karetek provides a claim chart of Claim 3 (and not claims 4 or 20) as the "Exemplary '515 Patent Claims." (*Id*. ¶ 32; D.I. 1-2 ("Exhibit 2 to Complaint") at 1.)

using the same credentials without specifying any particular way to accomplish this objective. *See* '515 Patent at Claim 4 (*i.e.*, "communicating a PIN and a first primary identification" over a first network, "receiving an encrypted passcode" over the first network, "decrypting the passcode," and "communicating the passcode and a user ID" over a second network).

Karetek's patent does no more than withdraw a basic idea (confidentially authenticating a user) from the public domain without disclosing any particularized application of that idea. Therefore, the '515 Patent is directed to patent-ineligible subject matter under § 101, and Karetek's Complaint should be dismissed.

## III.    STATEMENT OF THE FACTS

The '515 Patent, entitled "Multi-Factor Authentication System," discloses "a multi-factor authentication system used for authenticating a suspect user seeking access to a network resource from an access authority of a computer network." The '515 Patent explains that there was an "increasing number of systems each requiring a user ID and password," which "ultimately confuses users." '515 Patent, 1:37-39. To reduce this "confusion" of having multiple login credentials, "users typically choose easy-to-remember-passwords" because "[o]therwise, users tend to forget complex passwords and record the passwords in easily accessible areas for later reference." *Id*. at 1:39-43. The use of such "simple passwords reduces security at a time when security attacks are increasing and are increasingly expensive when they occur." *Id*. at 1:51-54. Enforcing "complex passwords and requiring passwords to be changed frequently increases security, but also increases cost in the form of help desk and customer service calls for the resetting of passwords." *Id.* at 1:55-58.

The applicants admitted that existing single sign-on and two-factor authentication systems addressed these purported challenges. *Id.* at 1:66-2:28. But existing systems were "limited to accessing network resources of a single enterprise" and were "susceptible to a security problem

known as 'keys to the kingdom.'" *Id.* at 2:2-8. And while existing two-factor authentication systems were "stronger forms for authenticating user IDs," each token used "is expensive, subject to loss, and typically restricted to use with one or more network resources of a particular computer network." *Id.* at 2:12-28. The applicants sought to overcome "one or more of these disadvantages" with an "improved multi-factor authentication system." *Id.* at 2:29-34.

In their purportedly "improved multi-factor authentication system," the applicants explained that when a "suspect user" wants to gain access to a network resource, the suspect user "communicates" a PIN and a first primary identification over an ancillary communication network to an authentication authority. *Id.* at 9:63-67; *see also* Cl. 4. The authentication authority "compares the suspect PIN with a PIN of an authorized user that is retrieved based on the primary ID." *Id.* at 9:67-10:2. If the suspect PIN matches the PIN of an authorized user, then the authentication authority "communicates" to the suspect user an "encrypted passcode" over the ancillary communications network. *Id.* at 10:2-8. The passcode is "decrypt[ed] using a [] key of an asymmetric key pair," and then the decrypted passcode and a user ID are "communicat[ed] to the access authority [] over a communications network." *Id.* at 10:30-36.

The "first primary identification" includes "a device ID and/or a domain ID that identifies the access authority for the network resource." *Id.* at 2:66-3:1. The PIN is described as "a shared secret," which can be a passcode or a password. *Id.* at 9:26-30. "The ancillary communications network preferably comprises a telecommunications network," such as a wireless network, and "the communications network" preferably comprises a computer network," such as "the Internet." *Id.* at 9:45-48, 3:11-13. The two network "identify different communications networks." *Id.* at 9:36-38. In particular, the ancillary communications network refers to a communications network between a user and an authentication authority, and the communications network refers to a

communications network between a user and an access authority. *Id*. at 9:36-54. "Strong encryption" is necessary for transmission over the ancillary wireless network because it is "an untrusted network channel." *Id*. at 23:33-36. Both the "authentication authority" and the "access authority" are defined broadly as "a program, module, or a server, or refer to an entity maintaining such program, module, or server." *Id*. at 8:21-26.

Karetek alleges that Claim 3 of the '515 Patent is practiced when a user initiates a login session on a website (such as Stripe.com) using two-step authentication. (D.I. 1-2 at 19.) In particular, Karetek asserts that the Stripe's website practices Claim 3 because it uses the FIDO U2F standard to gain access by a user to a network resource. (*Id*.)

## IV.    ARGUMENT

### A.    LEGAL STANDARD

#### 1.    This case should be decided at the pleading stage under Rule 12(c).

A Rule 12(c) motion may be made "after the pleadings are closed but within such time as not to delay the trial." Fed. R. Civ. 12(c). The difference between Rules 12(b)(6) and 12(c) is purely procedural as 12(c) requests for dismissal are governed by the same standards as 12(b)(6) motions. *See Turbe v. Government of the Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991). Under Rule 12(b)(6), a party may move to dismiss a complaint that fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, a complaint "must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3rd Cir. 2007) (citation omitted). In deciding a Rule 12(b)(6) motion, courts consider documents attached to or incorporated into the complaint as well as facts alleged in the complaint. *Gibbs v. Coupe*, No. CV 14-790-SLR, 2015 WL 6870033, at *1 (D. Del. Nov. 6, 2015 (citation omitted). Although factual allegations are taken as true, legal conclusions are given no deference—those matters are left for

the court to decide. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting tenet that allegations are taken as true on a motion to dismiss "is inapplicable to legal conclusions"). "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief [as a matter of law], this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Cuvillier v. Sullivan*, 503 F.3d 397, 401 (5th Cir. 2007) (internal citations and quotations omitted).

Patentability under 35 U.S.C. § 101 is a threshold legal issue. *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). Accordingly, the § 101 inquiry is properly raised at the pleadings stage if it is apparent from the face of the patent that the asserted claims are not directed to eligible subject matter. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 718-19 (Fed. Cir. 2014) (Mayer, J., concurring). In those situations, claim construction is not required to conduct a § 101 analysis. *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1374 (Fed. Cir. 2016) ("Claim construction is not an inviolable prerequisite to a validity determination under § 101.") (internal citations and quotations omitted).

### 2.    The law of 35 U.S.C. § 101.

Determining whether a patent claim is impermissibly directed to an abstract idea involves two steps. First, the court determines "whether the claims at issue are directed to a patent-ineligible concept." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). Second, if the claim contains an abstract idea, the court evaluates whether there is "an 'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* (internal quotations and citations omitted).

### B.    The claims of the '515 Patent are patent-ineligible.

The claims of the '515 Patent are invalid under § 101 because they fail both prongs of the

5

*Alice* test. First, each of the claims is directed to the abstract idea of confidentially authenticating a user. Second, none of the claim elements contain an "inventive concept sufficient to ensure that the patents in practice amount to ***significantly more*** than a patent upon the ineligible concept itself." *See Alice*, 134 S. Ct. at 2355 (emphasis added).

### 1.    Claim 4 of the '515 Patent is representative.

Claim 4 of the '515 Patent is representative.[2] *Accord Phoenix Licensing, L.L.C. v. Consumer Cellular, Inc.*, No. 2:16-cv-0152-JRG-RSP, 2017 WL 1065938, at *8-9 (E.D. Tex. Mar. 8, 2017) (invalidating 974 claims after analyzing only a few "representative claims" where the other claims were "substantially similar" and "linked to the same abstract idea."). The remaining claims of the '515 Patent recite the same abstract idea: confidentially authenticating a user. *See PPS Data, LLC v. Jack Henry & Assocs., Inc.*, No. 2:18-cv-00007-JRG, 2019 WL 1317286, at *5 (E.D. Tex. Mar. 21, 2019) (articulating that defendants first bear the burden of demonstrating a claim is representative, which then shifts to the plaintiff to identify a difference material to the § 101 analysis).

The '515 Patent's ten independent claims (claims 1-5, 9, 18-21) claim substantially the same subject matter with only minor variations. Representative Claim 4 recites:

> 4. A method for gaining access by a user to a network resource, comprising the steps of:
> (a) communicating a PIN and a first primary identification over an ancillary communications network to an authentication authority;
> (b) receiving an encrypted passcode over the ancillary communications network from the authentication authority;
> (c) decrypting the passcode using a key of an asymmetric key pair; and
> (d) communicating the passcode and a user ID over a communications network to an access authority.

The remaining independent claims claim substantially the same invention and are written

---

[2] Where claims are "substantially similar and linked to the same abstract idea," courts may look to representative claims in a § 101 analysis. *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014).

in the same high-level, results-based, functional terms. The only differences relate to token or insignificant pre- or post-solution activity. For example, Claim 1 "compar[es] the suspect PIN with the PIN of the authorized user" to generate and encrypt a passcode. Claim 2 adds the steps of "retrieving" the PIN based on the primary identification received and "maintaining" the passcode for later retrieval. Claim 3 authenticates a suspect user by using a "challenge" and "comparing" the response. Claims 5, 9, 18, and 19 add the steps of "generating an asymmetric key pair" and "communicating" a first key of the asymmetric key pair to an authentication authority over the ancillary network. Claims 5 and 9 "display[]" the passcode to the user. Claim 19 compares the decrypted registration code with the encrypted registration code. Claim 20 sends the User ID and passcode to the authentication authority and receiving an indication of successful passcode comparison. Claim 21 "bind[s] a device ID" with a PIN, the private key of the device, and the user ID. The specification confirms that the core of the claims is the abstract idea of confidentially authenticating a user and allowing the user to login to multiple sites using the same credentials.

The additional limitations in the dependent claims similarly do not confer patent eligibility because they recite token extra-solution limitations or generic processing. *Alice*, 134 S. Ct. at 2359. Specifically:

- Claims 6 and 11 specify that the "first primary identification" comprises the device ID and the domain ID;
- Claims 7 and 13 recite "communicating" a second PIN and a second primary identification and "receiving," "decrypting," and "displaying" a second encrypted passcode over the ancillary communications network from the authentication entity;
- Claims 8 and 14 specify that the second primary identification of Claim 7 comprises the device ID and the second domain ID;
- Claim 10 recites "receiving," "communicating," "decrypting," and "displaying" the passcode;
- Claim 12 recites "receiving," "encrypting," and "communicating" a second PIN and a second primary identification and "communicating," "receiving," "decrypting," and "displaying" a second encrypted registration code over the ancillary communications network from the authentication entity;

- Claim 15 recites calculating a challenge response as a function of the challenge, the suspect PIN and the first key of the secondary key pair of the authentication authority
- Claim 16 specifies that the challenge of Claim 15 is received through the user-input of the device; and
- Claim 17 specifies that the function of Claim 15 comprises hashing the challenge, the suspect PIN, and the first key of the secondary key pair of the authentication authority.

These trivial limitations cannot confer patent eligibility. *See, e.g.*, *Bilski*, 561 U.S. at 612 ("[L]imiting an abstract idea to one field of use or adding token post-solution components d[oes] not make the concept patentable."). The only differences are immaterial in the context of a § 101 analysis and relate to (i) specifying the type of date to be "communicat[ed]" (dependent Claims 6, 7, 8, 11, 12, 13, 14); (ii) specifying additional generic processing such as "displaying" (dependent Claim 10); (iii) specifying that a challenge response is "calculated" as a function, including by hashing certain data (Claims 15, 17); and (iv) specifying that data is received through the user input of the device (dependent Claim 16). None of these additional features amounts to an inventive feature or renders the claims any less abstract. *See, e.g., Hewlett Packard Co. v. Servicenow*, Inc., No. 14-cv-00570-BLF, at *9 (N.D. Cal. Mar. 10, 2015) (finding a limitation requiring "displaying" of service tickets as not "an inventive concept"); *Mgmt. Sci. Assocs. v. Datavant, Inc.*, No. 20-0502, 2020 WL 7771156, at *11 (D. Del. Dec. 30, 2020) (Connolly, J.) (explaining that "hashing" information in a dependent claim does not affect subject matter eligibility).

The resemblance of Claim 4 to the other independent claims is further supported by the fact that in its Complaint, Karetek characterizes each of the independent claims the same way. For example, Karetek cannot differentiate the purportedly "specific elements" of Claim 4 from Claim 20. *See* Complaint at ¶ 24. Accordingly, Claim 4 is representative for the § 101 analysis. *See PPS Data*, 2019 WL 1317286, at *5.

2.    *Alice* **Step 1: The '515 Patent is directed to the abstract idea of confidentially authenticating a user.**

Claim 4 of the '515 Patent is directed to an unpatentable, abstract idea because it claims nothing more than the "longstanding," "routine," and "conventional" concept of confidentially authenticating a user. *See Alice*, 134 S. Ct. at 2356; *Bilski*, 561 U.S. at 611. In assessing whether a claim is directed to an abstract idea, courts begin by analyzing the "focus" of the claim, i.e., its "character as a whole," in order to determine whether the claim is directed to an abstract idea. *See SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018). For example, the Federal Circuit has explained that courts should examine the patent's "'claimed advance' to determine whether the claims are directed to an abstract idea." *Finjan, Inc. v. Blue Coat System, Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018).

The functional nature of Claim 1's limitations supports its abstractness. Stripped of its excessive verbiage, Claim 4 recites as a series of basic steps to practice the abstract idea of confidentially authenticating a user and allowing the user to login to multiple sites using the same credentials by: (1) "communicating" a "device ID and/or a domain ID" (i.e., a first primary identification") over a first "ancillary" network (i.e., a telecommunications network, such as a wireless network) to an "authentication authority"; (2) "receiving" an encrypted passcode over the first ancillary network from the authentication authority; (3) "decrypting" the passcode using an asymmetric key; and (4) "communicating" the passcode and a user ID over a second "communications network" (e.g., the Internet) to an "access authority." '515 Patent at Cl. 4. At its core, Claim 4 boils down to the steps of (1) sending and receiving data over one network, (2) processing the data received (i.e., decrypting); and (3) sending the processed data and a user ID over a second network. In short, Claim 4 recites, in purely result-based functional language, an abstract method for sending, receiving, and processing data. *Two-Way Media Ltd. v. Comcast*

9

*Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) (method using result-based functional language, such as "converting," "routing," "controlling," "monitoring," and "accumulating records," but did not sufficiently describe how to achieve these results in a non-abstract way, directed to abstract idea of routing information).

Moreover, authentication is an activity "humans have always performed." *Content Extraction*, 776 F.3d at 1347. People consummate transactions without disclosing confidential information in numerous contexts—for example, when a buyer uses an agent to confidentially acquire goods or bid at auction. This basic human activity precedes the computer age. During prohibition, speakeasies required patrons to use a special knock on the door and then provide a secret password to authenticate themselves. A modern example is being required to show your ticket along with a driver's license or passport to confirm your identity at airport security and then presenting the authorized ticket at the gate. As these comparisons illustrate, the confidential, authenticated interactions claimed by the '515 Patent are no different from the patent-ineligible activities humans have long performed, and merely automated using conventional computer technology. *See Alice*, 134 S. Ct. at 2359 (holding that routine activity long performed by humans and simply implemented on a computer is not a proper basis for patentability).

The decision in *Universal Secure Registry* is instructive. In *Universal Secure Registry*, the court found the representative claim was "directed to the abstract idea of secured verification of a person's identity." 469 F. Supp. 3d at 238. The court found that the disclosed steps "do not teach a technological solution but instead disclose an authentication method that is accomplished by retrieving and reviewing information, including biometric information, using a handheld device and a second device, to authenticate a user's identification." *Id*. at 238-39. The same is true here. Claim 4 recites steps for sending and receiving data over a first networks (i.e., an "ancillary

communications network"), processing that information, and sending that processed information over a second network (i.e., a "communications network"), but it does not recite how to implement these functions other than to use generic computer components to achieve the desired end result of confidentially authenticating a user.

Numerous other courts have also invalidated patents related to authentication techniques as patent-ineligible under *Alice*. One court found claims directed to a "method for authenticating a user during an electronic transaction" as ineligible under § 101. *See Asghari-Kamrani v. United Servs. Auto Ass'n,* No. 2:15-cv-478, 2016 WL 3670804 (E.D. Va. July 5, 2016), amended, 2016 WL 11642758 (E.D. Va. Aug. 15, 2016), aff'd, No. 16-2415 (Fed. Cir. 2018); *see, also*, *Zapfraud, Inc. v. FireEye, Inc.*, No. CV 19-1688, 2020 WL 6822972, at *7 (D. Del. Nov. 20, 2020) (invalidating authentication patent because "humans can take steps similar to those found in the claimed method in order to determine whether a message is authentic"); *Aegis 11 S.A. v. Tte Tech., Inc.*, No. CV 19-1165-RGA, 2020 WL 4050415, at *3 (D. Del. July 20, 2020), (granting Rule 12 motion and invalidating patent directed to multi-device "mutual authentication"); *Money & Data Prot. Lizenz GMPH & Co. KG v. Duo Sec., Inc.*, 468 F. Supp. 3d 674, 675 (D. Del. 2020) ("The #903 patent is directed to the authentication (i.e., verification) of the identification of the user of a device or terminal to conduct a transaction…" which involved "providing an authentication step in which an authentication device uses a second communication channel for checking an authentication function that is implemented in a mobile device of the user").

The abstract concept of the '515 Patent "does not become nonabstract" merely because the claims involve the "technological environment" of conventional components and the use of standard communications systems. *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1319 (Fed. Cir. 2016) (citation omitted). Although the '515 Patent claims contain "concrete,

tangible components," such "recited physical components merely provide a generic environment in which to carry out the abstract idea of classifying and storing digital [data] in an organized manner." *In re TLI*, 823 F.3d 607.

Moreover, like other computer-implemented claims found patent-ineligible, the '515 Patent claims merely claim a "desired result" without explaining "how this would be technologically implemented"—the claims specify no "particular way of programming or designing the software." *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241, 1244 (Fed. Cir. 2016). Instead, they contain broad functional language and only recite a desired goal of confidentially authenticating a user and allowing the user to login to multiple sites using the same credentials, without specifying any particular way to accomplish this objective. *See* '515 Patent at Claim 4 (*i.e.*, "communicating a PIN and a first primary identification" over a first network, "receiving an encrypted passcode" over the first network, "decrypting the passcode," and "communicating the passcode and a user ID" over a second network). Such "vague, functional" terms, "devoid of technical explanation as to how to implement the invention," cannot confer eligibility. *In re TLI*, 823 F.3d at 615; *see also, e.g.*, *Elec. Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1355-56 (Fed. Cir. 2016); *Affinity Labs of Texas, LLC v. DirecTV, LLC*, 838 F.3d 1253, 1265 (Fed. Cir. 2016).

Federal Circuit cases finding claims patent eligible at *Alice* step one are notably distinguishable from this case. *See, e.g.*, *Ancora Techs., Inc. v. HTC America, Inc.*, 908 F.3d 1343, 1348 (Fed. Cir. 2018); *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1007 (Fed. Cir. 2018); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016); *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253 (Fed. Cir. 2017). In those cases, unlike here, the claims recited "a ***specific technique***

that departs from earlier approaches to solve a ***specific computer problem***." *Ancora*, 908 F.3d at 1348; *see also Data Engine*, 906 F.3d at 1008; *Enfish*, 822 F.3d at 1336; *McRO*, 837 F.3d at 1313-14; *Visual Memory*, 867 F.3d at 1259-60 (determining that "claims focus on a 'specific asserted improvement in computer capabilities'—the use of programmable operational characteristics that are configurable based on the type of processor—instead of 'on a process that qualifies as an "abstract idea" for which computers are invoked merely as a tool'") (citation omitted).

Here, the '515 Patent "fails to provide any details for the tangible components" and "instead predominantly describes the system and methods in purely functional terms" using nothing more than generic components and processing. *See* '515 Patent at 8:9-35 (describing generic components, networks, and processing); *id.* at 22:35-52 (describing known encryption techniques); *see also In re TLI*, 823 F.3d at 612 (distinguishing *Enfish*); *see also FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1094-95 (Fed. Cir. 2016) (distinguishing *McRO* and *Enfish*). As discussed above, the claimed steps and components "do no more than describe a desired function or outcome, without providing any limiting detail" to "confine[] the claim to a particular solution." *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016). The '515 Patent does not purport to teach any new computer capability, but rather relies on use of the well-known capabilities of computers. *See, e.g.,* '515 Patent at 8:9-35; *see also id.* at 22:35-52. That is, Claim 4 of the '515 Patent does not recite "an improvement in computers as tools," but instead "use[s] computers as tools" to perform the abstract idea of confidentially authenticating a user. *See Elec. Power*, 830 F.3d at 1354; *see also Intellectual Ventures I LLC v. J. Crew Grp., Inc.*, No. 6:16-cv-196-JRG, 2016 WL 4591794, at *6 (E.D. Tex. Aug. 24, 2016) ("[T]he '370 Patent discloses nothing more than an abstract marketing idea implemented by general computer components.") (citing *Enfish*, 822 F.3d at 1338).

Nothing in Claim 4 of the '515 Patent shows any methodology that would amount to a "specific improvement in the way computers operate." Rather, Claim 4 recites conventional computing methods. *See, e.g.*, '515 Patent at Cl. 4 ("communicating [information] over [a telecommunications network] to [a generic computer component or program]," "receiving [information] over [a telecommunications network] from [a generic computer component or program]," "decrypting [data]," and ""communicating [information] over [the Internet] to [a generic computer component or program]"). Therefore, the focus of Claim 4 of the '515 Patent is not "on [a] specific asserted improvement in computer capabilities" but instead "on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish*, 822 F.3d at 1336.

### 3.    *Alice* Step 2: Claim 4 contains no inventive concept to transform the abstract idea into patent-eligible subject matter.

Claim 4 of the '515 Patent fails *Alice*'s second step because it adds nothing inventive to the abstract idea of confidentially authenticating a user. To pass *Alice*'s second step, Claim 4 "must include additional features" that "must be more than well-understood, routine, conventional activity." *Ultramercial*, 772 F.3d at 715 (quotation omitted). Here, Claim 4 is broadly generic and does not contain meaningful limitations that would restrict it to a non-routine, specific application of the abstract idea.

The elements of Claim 4 recite the performance of the abstract idea using conventional computer functions: "communicating a PIN and a first primary identification over an ancillary communications network to an authentication authority," "receiving an encrypted passcode over the ancillary communications network from the authentication authority," "decrypting the passcode using a key of an asymmetric key pair," and "communicating the passcode and a user ID over a communications network to an access authority." '515 Patent, Cl. 4; Complaint ¶ 24.

But sending and receiving information, such as a "first primary identification," a "PIN," a "passcode," and a "user ID," are "basic functions of a computer" and do not make the claims eligible. *Alice*, 134 S. Ct. at 2359-60 (citation omitted). Indeed, no special computer or programming is disclosed or required. Rather, both the "authentication authority" and the "access authority" are defined broadly and in generic terms in the specification as "a program, module, or a server, or refer to an entity maintaining such program, module, or server." '515 Patent at 8:21-26. The claims specify only that one set of information (PIN and a first primary identification) is "communicated" over a first "ancillary communications network," such as a telecommunications network, and the second set of information (passcode and user ID) is communicated over a second "communications network," such as the Internet. *Id*. at 9:45-48, 3:11-13.

The steps dealing with encryption in Claim 4 also fail to supply an inventive concept. Encryption is ubiquitous. *See, e.g.*, *Paone v. Broadcom Corp.*, No. 15-CV-0596-BMC-GRB, 2015 WL 4988279, at *7 (E.D.N.Y. Aug. 19, 2015) ("Encryption, in general, represents a basic building block of human ingenuity that has been used for hundreds, if not thousands, of years.") (citation omitted). This is especially true because the Claim 4 fails to disclose any specific method of encryption, let alone any inventive encryption technique. Rather, the applicants noted that certain existing techniques could be used without modification to achieve the desired "strong encryption" over the "untrusted" wireless network (i.e., the "ancillary network"), such as the "NTRU algorithm from NTRU Cryptosystems, Inc." '515 Patent at 22:35-52; 23:33-45. Claims describing generic methods of encryption routinely fail *Alice* step 2. For instance, the court in *Intellectual Ventures II* found claim features relating to encryption using corresponding encryption and decryption keys "fail[ed] to transform the . . . abstract idea into patent-eligible

15

subject matter." *Intellectual Ventures II LLC v. JP Morgan Chase & Co.*, No. 13-cv-3777, 2015 WL 1941331, at *14 (S.D.N.Y. Apr. 28, 2015). The encryption feature "fail[ed] to describe anything beyond well-understood, routine, conventional activity." *Id.* (citation omitted). Like *Intellectual Ventures II*, Claim 4 adds nothing inventive to authentication techniques.

Claim 4 is also similar to the single independent claim in *Digital Media* and is equally non-inventive. The alleged invention in *Digital Media* was a way for a server to securely send information, like a movie, over the internet to a client's device. *Digital Media Techs., Inc. v. Hulu, LLC*, No. 4:16-cv-245, 2017 WL 4750705, at *2 (N.D. Fla. July 3, 2017). The claim at issue in *Digital Media* recited a server that receives authentication information and a request for a movie from the client's device over a network. *Id.* After validating authentication, the server receives a request for a content license, which contains a content key. *Id.* at *2–*3. The server encrypts the content license and sends it to the client's device. *Id.* at *2. Finally, the client's device uses its private key to decrypt the content license and extracts the content key. *Id.* at *2–*3. The *Digital Media* court found that each step was "well-understood, routine, and conventional" and that "it is nothing new for servers and clients to send requests to each other . . . [n]or is it any more inventive to incorporate asymmetric/public-key encryption into an authentication system." *Id.* at *5. The only difference between Claim 4 and the claim in *Digital Media* is that Claim 4 employs the "ancillary communications network" to send and receive encrypted information and a second communications network to gain access a network resource. These trivial differences add nothing new to authentication or encryption techniques. *Cf. OpenTV, Inc. v. Apple Inc.*, No. 5:15-cv-02008-EJD, 2016 WL 344845, at *5 (N.D. Cal. Jan. 28, 2016) ("The practice of controlling access to information by verifying credentials . . . is a long-standing and well-understood business practice that predates the internet."); *cf. also Prism Techs. LLC v. T-Mobile USA, Inc.*, Nos. 2016-2031,

2016-2049, 2017 WL 2705338, at *2 (Fed. Cir. June 23, 2017) (nonprecedential) (holding that patent that was directed to abstract idea of "providing restricted access to resources" lacked inventive concept where the asserted claims "merely recite[d] a host of elements that are indisputably generic computer components")

Courts have repeatedly found such generic components and processing to be non-inventive. In *Alice*, for example, the Supreme Court held that claims reciting a "data processing system" with a "communications controller" for obtaining, modifying, and transmitting data was non-inventive. *Alice*, 134 S. Ct. at 2359-60. The Federal Circuit has held similar basic computer functions and components to be insufficient to confer eligibility. *See, e.g.*, *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367-71 (Fed. Cir. 2015) (using an "interactive interface" and "break[ing down] and organiz[ing] . . . data according to some criteria" and monitoring data is non-inventive); *buySAFE v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (sending data over network is "'not even arguably inventive'"); *Dealertrack*, 674 F.3d at 1333-34 ("selectively forwarding" information and forwarding reply data is non-inventive). Indeed, as one court has observed: "generic technological elements of the claims . . . do not transform the abstract idea into something more." *Pragmatus Telecom., LLC v. Genesys Telecommc'ns. Labs., Inc.*, 114 F. Supp. 3d 192, 201 (D. Del. 2015).

The same is true for Claim 4. Even when these basic functions and components are viewed "as an ordered combination," they do not reveal a "non-conventional and non-generic arrangement of known, conventional pieces" that might provide an inventive concept. *Cf. Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). The claims' arrangement of computer processes merely automates necessary steps to confidentially authenticate a user, which "cannot confer patent eligibility." *In re TLI*, 823 F.3d at 615. "A claim

that recites an abstract idea must include 'additional features'" that must be more than the "mere recitation of a generic computer." *Pragmatus Telecom*, 114 F. Supp. 3d at 198 (citations omitted). The claims here add nothing beyond unspecified conventional computer components implemented with generic software to merely perform the abstract idea.

The recited limitations are insufficient to add "significantly more" to the abstract idea. Because they are altogether devoid of any "inventive concept," Claim 4 and the other independent claims of the '515 Patent are thus patent-ineligible under § 101. *See Alice*, 134 S. Ct. at 2359-60.

### 4. There are no claim construction or factual disputes preventing the Court from ruling on these issues at the Rule 12 stage.

The issue of patent eligibility is ripe for the Court's consideration because there are no factual or claim construction issues precluding resolution on the pleadings. The § 101 issue can be resolved without claim construction because the routine steps of "communicating," "receiving," and "decrypting" information are well-understood for purposes of this analysis without construction. *O2 Micro Intl. Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360-63 (Fed. Cir. 2008) (emphasizing that claim construction is not an obligatory exercise in redundancy and is not required when terms have a well-understood meaning). The claimed steps of the '515 Patent are so generic, and the implementation so conventional (*e.g.*, "A method for gaining access by a user to a network resource"), that no construction would provide meaningful limitations to transform the abstract nature of the claims into an otherwise eligible and inventive concept. *See* '515 Patent at Cl. 4; *Alice*, 134 S. Ct. at 2357.

This case is markedly different from *Berkheimer* and the line of cases where factual issues have been found to exist in Alice Step 2. In *Berkheimer*, the Federal Circuit noted that the specification explicitly "describe[d] an inventive feature that store[d] parsed data in a purportedly unconventional manner." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018). The court

added that "[t]he improvements in the specification, to the extent they are captured in the claims, create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities . . . so we must analyze the asserted claims and determine whether they capture these improvements." *Id.* After finding that some claims "contain limitations directed to the arguably unconventional inventive concept described in the specification," the court held that there was a question of fact as to whether those claims perform "well-understood, routine, and conventional activities." *Id.* at 1370.

It should be noted, however, that "[t]he *Berkheimer* [] cases do not stand for the proposition that a plaintiff can avoid dismissal simply by reciting in the complaint that the invention at issue is novel and that the inventive concept resides in the abstract idea itself." *First-Class Monitoring, LLC v. Ups of Am., Inc.*, 389 F. Supp. 3d 456, 471 (E.D. Tex. 2019) (emphasis added). Furthermore, "[a]ny allegation about inventiveness, wholly divorced from the claims or the specification, does not defeat a motion to dismiss; only plausible and specific factual allegations that aspects of the claims are inventive are sufficient." *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 538 (Fed. Cir. 2020) (internal quotations omitted).

Here, Karetek's bare and implausible allegations in the complaint cannot defeat this motion; otherwise, Rule 12(b)(6) would be rendered toothless against plaintiffs who plead "magic words." Complaint ¶¶ 18, 23–29. Patentee plaintiffs should not have the power to unilaterally declare that their claims are inventive. *See Appistry, Inc. v. Amazon.com, Inc.*, 195 F. Supp. 3d 1176, 1183, n.6 (W.D. Wash., 2016) *aff'd sub nom. Appistry, LLC v. Amazon.com, Inc.*, 676 F. App'x 1008 (Fed. Cir. 2017) ("Plaintiff's position is absurd. Requiring the Court to accept such facts or legal conclusions (even in the form of an early expert declaration) would permit any plaintiff to circumvent the § 101 inquiry on an early motion to dismiss or motion for judgment on

the pleadings simply by including a few lines attesting to the novelty of the invention."). Karetek's "inventiveness" allegations betray that it is keenly aware of the claims' vulnerability.

The Court's ineligibility analysis should disregard Karetek's boilerplate legal conclusions about the inventive aspects of its asserted patents. *See Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1366 (Fed. Cir. 2020) ("We disregard conclusory statements when evaluating a complaint under Rule 12(b)(6)."). For example, Karetek alleges that "these specific elements . . . as combined, accomplish the desired result decreasing cost, reducing the likelihood of, and may not be restricted to use with one or more network resources of a particular computer network" and "overcome the then existing problems in the relevant field of network communication systems." Complaint ¶ 24. Karetek further alleges that the claim elements "were an unconventional arrangement . . . [to] generate a method for gaining access by a user to a network resource." *Id.* ¶¶ 26. These are not factual allegations—they are legal conclusions by which Karetek attempts to unilaterally declare its patents are directed to eligible subject matter. *See Simio*, 983 F.3d at 1366 ("A statement that a feature 'improves the functioning and operations of the computer' is, by itself, conclusory."). The Court should disregard these statements.

Once Karetek's conclusory legal allegations about the inventiveness of its asserted patents are properly disregarded, there is nothing left to preclude a determination of ineligibility on the pleadings. Accordingly, Stripe's motion is ripe, and it should be granted.

## V.    CONCLUSION

For the foregoing reasons, Stripe respectfully requests that the Court enter final judgment on the pleadings in favor of Stripe and against Karetek pursuant to Rule 12(c), along with all other relief this Court deems just and proper.

Dated: June 15, 2021

Respectfully submitted,

FISH & RICHARDSON P.C.

By: */s/ Jeremy D. Anderson*
Jeremy D. Anderson (No. 4515)
222 Delaware Avenue, 17th Floor
Wilmington, Delaware 19801
(302) 658-5070 (Telephone)
(302) 652-0607 (Facsimile)
janderson@fr.com

Neil J. McNabnay
Ricardo J. Bonilla
Adil A. Shaikh
1717 Main Street, Suite 5000
Dallas, Texas 75201
(214) 747-5070 (Telephone)
(214) 747-2091 (Facsimile)
mcnabnay@fr.com
rbonilla@fr.com
shaikh@fr.com

ATTORNEYS FOR DEFENDANT
STRIPE, INC.